THE SAFEGUARD INSURANCE COMPANY v. WILMINGTON COLD STOR-
AGE COMPANY, a N. C. CORPORATION; AND C. L. AUSTIN, HERBERT
W. CANNADY, JULIEN H. SQUIRES AND ALEXANDER P. MERCER,
D/B/A PORT CITY COLD STORAGE COMPANY, a CO-PARTNERSHIP.

(Filed 6 July, 1966.)

**1. Trial § 21—**

Upon motion for compulsory nonsuit, plaintiff's evidence is to be taken
as true and considered in the light most favorable to it, giving it the bene-
fit of every fact and inference of fact reasonably to be drawn therefrom
consistent with the allegations of its complaint.

**2. Pleadings § 29—**

Admissions in the answer of facts alleged in the complaint are judicial
admissions conclusively establishing the admitted facts for all purposes
connected with the trial without the necessity of introducing the admitted
facts in evidence.

**3. Insurance § 96.1—**

An insurer paying to insured a loss under the obligations of its policy
for property damaged by the tortious act of another is subrogated to the
rights of the insured against the tort-feasor to the extent of the loss paid
by insurer.

**4. Same—**

Insurer may establish its right to maintain its action as subrogee of
the insured by the introduction in evidence of its cancelled check issued
to insured in payment of the loss and the receipt signed by insured stat-
ing that it was in full satisfaction of claims under the designated policy
and subrogating insurer to any rights of insured against third parties
causing the damage, and objection to such evidence on the ground that
the policy itself was not offered in evidence by insurer is untenable.

**5. Parties § 2—**

An insurer who has paid insured the entire loss properly brings action
in its own name against third person tort-feasors allegedly causing the
loss.

**6. Bailment § 1—**

Warehousemen accepting property for cold storage under contract pro-
viding for the payment by the owner of monthly fees for such service, are
bailees for hire.

**7. Bailment § 3—**

Bailees for hire are not insurers of the property entrusted to their
possession, but are under duty to exercise ordinary care to protect the
property against loss, damage or destruction, and the duty to return the
property in as good condition as it was when received by them, and are
liable for negligence proximately causing loss, damage or destruction of
the property.

**8. Negligence § 1—**

While a person may not be held liable for damage resulting from an
"act of God" when there is no fault or negligence on his part, he may be

held liable for his own negligence which concurs with an "act of God" in producing the damage.

**9. Negligence § 7—**

What is the proximate cause of an injury is ordinarily a question for a jury, to be determined as a fact from the attendant circumstances, and conflicting causations arising from the evidence carry the case to the jury.

**10. Appeal and Error § 51—**

On appeal from compulsory nonsuit, any incompetent evidence admitted at the trial must be considered in passing upon the sufficiency of the evidence, since, if the incompetent evidence had been excluded, plaintiff might have introduced competent evidence upon the point.

**11. Bailment § 3— Evidence held for jury on issue of bailees' negligence in failing to take steps to mitigate damage resulting from act of God.**

Evidence and judicial admissions tending to show that bailor delivered bales of raccoon skins in a dry and good condition to the original bailee for hire, that while the property was in the exclusive control of this bailee a storm damaged the roof of the warehouse in which the goods were stored, that a few days thereafter the successor of the original bailee purchased the warehouse business and had exclusive control of the property until the bales of skins were surrendered to the bailor more than a month thereafter, that the skins delivered were damaged by mold and had the appearance of having been wet, and that neither bailee inspected the bales after the storm and took no steps to mitigate damage already caused by water from the storm, and that neither bailee notified bailor of their wet condition so that he could take proper precaution to prevent further deterioration, *held* sufficient to be submitted to the jury on the question of negligence on the part of each bailee concurring with the act of God in proximately causing the loss.

**12. Trial § 23—**

A *prima facie* case takes the issue to the jury, but the ultimate burden of establishing the cause of action remains upon plaintiff.

MOORE, J., not sitting.

DENNY, E.J., took no part in the consideration and decision of this case.

FROM a judgment of compulsory nonsuit of plaintiff's action entered at the close of plaintiff's evidence by *Mintz, J.,* November 1965 Civil Session of NEW HANOVER, plaintiff appeals to the Supreme Court.

*Aaron Goldberg and David H. Scott for plaintiff appellant.*
*Hogue, Hill & Rowe by C. D. Hogue, Jr., for defendant appellee Wilmington Cold Storage Company.*
*Carter, Murchison, Fox & Newton by Oliver Carter for defendant appellees C. L. Austin, Herbert W. Cannady, Julien H. Squires*

*and Alexander P. Mercer, d/b/a Port City Cold Storage Company, a partnership.*

PARKER, C.J. Plaintiff assigns as error the entry of the judgment of compulsory nonsuit of its action entered at the close of its evidence.

In considering whether the court erred in entering the judgment of compulsory nonsuit here, plaintiff's evidence is to be taken as true, and its evidence must be considered in the light most favorable to plaintiff, giving it the benefit of every fact and inference of fact reasonably to be drawn therefrom consistent with the allegations of its complaint. *Benton v. Montague,* 253 N.C. 695, 117 S.E. 2d 771; 4 Strong's N. C. Index, Trial, § 21.

Considering plaintiff's evidence in accordance with these rules, it tends to show the following facts:

T. T. Ward on 27 May 1958 stored 39 bales of raw raccoon skins in a cold storage warehouse owned and operated for hire by Wilmington Cold Storage Company in Wilmington, North Carolina. The 39 bales contained about 20,000 raw raccoon skins, and each bale was a little smaller than a 500-pound bale of cotton. The raw raccoon skins in these 39 bales were in good condition when he delivered them to the Wilmington Cold Storage Company. He knew he had to get these raw raccoon skins in cold storage during the hot summer months. These bales of raw raccoon skins were stored on the top or fifth floor of the cold storage warehouse, on top of two-by-fours standing on edge with strips across the two-by-fours so that the bales of raccoon skins were about four inches above the floor. On 5 July 1958 Ward removed one bale of the raccoon skins from the cold storage warehouse, and the condition of the raccoon skins in that bale was good, and the raccoon skins were not damaged at all.

On 19 December 1958 Ward withdrew the remaining 38 bales of raw raccoon skins from the cold storage warehouse. He opened the bales and examined the raw raccoon skins; at that time the raccoon skins were in a bad moldy condition. Ward testified: "When the bales were delivered to my place of business, with the exception of the one they told me was wet, the outside appearance of the other bales indicated to me that they had been wet; they were moldy."

Plaintiff alleged in its verified complaint, and both defendants admitted in their separate verified answers, facts in substance as follows: On 1 October 1958 defendants C. L. Austin, Herbert W. Cannady, Julien H. Squires, and Alexander P. Mercer, d/b/a Port City Cold Storage Company, a co-partnership, bought the cold storage warehouse in which Ward's raw raccoon skins were stored from

Wilmington Cold Storage Company, and began the operation of a cold storage warehouse for hire. Plaintiff alleged in its verified complaint "that on or about the 27th day of September 1958, while the furs were still in said storage, a storm known as Hurricane Helene struck Wilmington, N. C., which was known to the defendants, parties to this action," and defendant Wilmington Cold Storage Company admitted in its answer "that a storm known as Hurricane Helene struck Wilmington, North Carolina on the 27th day of September 1958. All other allegations of paragraph 13 of the complaint, not herein admitted, are denied." Plaintiff alleged in its verified complaint "that this storm did so much damage to the roof covering the warehouse building of the defendant Wilmington Cold Storage Company in which the furs were stored that it had to be replaced by a new roof, all of which was known to the defendants, parties to this action," and defendant Wilmington Cold Storage Company admitted in its answer "that the storm did some damage to the roof of the building in which the coon skins were stored; it is further admitted that the said roof had to be repaired, which was done immediately. All other allegations of paragraph 14 of the complaint, not herein admitted, are denied." These admissions are judicial admissions conclusively establishing the admitted facts as true for all purposes connected with the trial of the case, and such admitted facts do not have to be introduced in evidence. *Snell v. Caudle Sand and Rock Company, Inc.*, 267 N.C. 613, 148 S.E. 2d 608.

Woodrow W. Lennon, supervising meteorologist, U. S. Department of Commerce Weather Bureau, stationed in Wilmington on 27 September 1958, testified as a witness for plaintiff in substance: On 27 September 1958 Hurricane Helene visited Wilmington.

A reasonable inference to be drawn from the judicial admissions by Wilmington Cold Storage Company that a storm known as Hurricane Helene struck Wilmington, North Carolina, on 27 September 1958 and that the storm did some damage to the roof of the warehouse building in which the furs were stored and that the roof had to be repaired, and from plaintiff's evidence considered in the light most favorable to it, is that water from the hurricane came through the roof and into the top floor of the cold storage warehouse owned and operated at that time by Wilmington Cold Storage Company and caused the 38 bales of raccoon skins to become wet. T. T. Ward testified in part: "I said I did hear about Hurricane Helene, occurred on September 20 *(sic)*, 1958. I did not come to Wilmington then to check, to see about these skins; it didn't cross my mind. I thought they were safe; I hadn't thought about it either way. . . . I got no word from the cold storage plant after Hurricane Helene that the roof of that plant had been blown off."

While these bales of raccoon skins were stored in the cold storage warehouse Ward received seven bills for the cost of such storage, and he gave his checks in payment. Five of these bills, going from May 1958 through September 1958, were from Wilmington Cold Storage Company, and two for 1 November and 1 December 1958 were from Port City Cold Storage Company. The parties stipulated that these bills were paid by Ward. Wilmington Cold Storage Company had possession of the 39 bales of raccoon skins from the time that it received them and gave Ward a receipt for them until 5 July 1958, and of the 38 bales of raccoon skins from 5 July 1958 until it sold its cold storage warehouse on 1 October 1958 to Port City Cold Storage Company, a co-partnership; and Port City Cold Storage Company, a co-partnership, had possession of the 38 bales of raccoon skins from 1 October 1958 until they were taken out by Ward on 19 December 1958.

T. T. Ward lives in Rocky Mount, North Carolina, and is engaged in business under the trade name of North Carolina Hide & Fur Company. George Wilkinson, a witness for plaintiff, testified in substance as follows: He lives in Rocky Mount and in May 1958 and thereafter was engaged in the insurance business as a general agent, and represented the Safeguard Insurance Company. He did not know T. T. Ward of Rocky Mount personally. He knew the account, the North Carolina Hide & Fur Company. T. T. Ward, the owner of the North Carolina Hide & Fur Company of Rocky Mount, made application to his agency for the issuance of a policy of insurance covering some furs which Ward had placed for storage in the Wilmington Cold Storage Company in Wilmington, North Carolina. He was permitted to testify over the objection of counsel for Wilmington Cold Storage Company that his agency acted upon that application. The policy was issued on or about 27 May 1958 under his direction by Safeguard Insurance Company. The court refused to permit him to answer the amount of the policy. Upon cross-examination by counsel for Port City Cold Storage Company, he testified without objection: "I do not have the original of that insurance policy in my possession now. I did have the original in my possession. I had it when it was cancelled. As to what I did with it then, the cancelled policy was ultimately sent to the home office of the insurance company in Hartford. I sent the original back to the Safeguard Insurance Company. Safeguard is the plaintiff in this action. I don't have that original policy with me here today." Immediately thereafter Wilkinson, without objection, testified in response to questions by the court in substance as follows: After the settlement with the insured the policy was sent back to his agency for cancellation, and that was when he saw the policy. It is customary for the in-

sured to surrender his policy at the time he is paid. By simply referring to his records he knows the face value of the policy was $20,000. Wilkinson was permitted to testify over the objection of counsel for Wilmington Cold Storage Company, which objection was overruled, that the loss draft was payable to T. T. Ward, trading as North Carolina Hide & Fur Company, in the sum of $12,063.60. This draft was issued by his office. Wilkinson was further permitted to testify over the objection of counsel for both defendants that this was a standard fire policy carrying extended coverage. Wilkinson testified without objection as follows: "I have stated that my company had issued a policy of insurance to Mr. Ward, as North Carolina Hide & Fur Company." Then the record shows the following:

"Q. Mr. Wilkinson, did you pay a claim for damage to the furs that were stored in the cold storage warehouse in Wilmington, North Carolina, to Mr. Ward?

MESSRS. HOGUE AND CARTER: OBJECTION — OVERRULED.

"A. I did.

MESSRS. HOGUE AND CARTER: Move to strike the answer — MOTION DENIED.

"Q. I hand you a paper and ask you to examine it and tell me what it is?

"A. This is a copy of the draft that was issued in payment of the loss.

MESSRS. HOGUE AND CARTER: Move to strike the answer — MOTION DENIED.

"It was issued to T. T. Ward, trading as North Carolina Hide & Fur Company. It was issued on Safeguard Insurance Company.

"(This copy of draft above mentioned was identified as Plaintiff's Exhibit 16)."

The court permitted, over objection of both defendants, plaintiff to introduce in evidence plaintiff's Exhibit marked for identification Plaintiff's Exhibit 16. Both defendants excepted to its admission. The court permitted, over objection of both defendants, plaintiff to introduce in evidence a subrogation receipt marked Exhibit 15. Both defendants excepted to its admission. The joint brief of both defendants states: "Plaintiff did not attach a copy of the policy to its complaint. It did not offer the alleged policy in evidence. It offered only a subrogation receipt (Plaintiff's Exhibit 15, R. pp. 9, 115) and a copy of a draft it had given to Ward (Plaintiff's Exhibit 16, R. p. 115)."

The pertinent parts of this subrogation receipt read as follows:

"Received of the Safeguard Insurance Company the sum of TWELVE THOUSAND SIXTY-THREE AND 60/100 DOLLARS ($12,063.60) in full satisfaction of all claims and demands of the undersigned against the said company under its policy No. 192926 arising from or connected with any loss or damage by reason of Water Damage To Furs On Storage which loss or damage occurred on or about the 27th day of September 1958.

"In consideration of and to the extent of said payment, the undersigned hereby subrogates, assigns and transfers to the said company all of the rights, claims, demands and interest which the undersigned has or may have against any parties for said loss or damage. . . . Said insurance company shall thereupon be subrogated to all rights of the undersigned against any such parties for such loss and damage. The undersigned has not released and will not release any portion of said claims, except as hereinafter indicated.

"Exceptions:　No exceptions.

"Dated:　January 3, 1959.

.......................................................... (L. S.)
N. C. HIDE & FUR COMPANY
By: T. T. WARD, Officer."

Both defendants contend in their joint brief that the judgment of nonsuit should be sustained for the reason "plaintiff did not prove a contract of insurance to support its alleged subrogation." In respect to this contention they state in their joint brief: "In its complaint, plaintiff alleged only that 'said Ward insured these bales of furs with the Plaintiff for the sum of $20,000.00.' (Complaint, par. 8, R. p. 2.) No allegation was made as to the terms of the alleged insurance or the extent of the coverage or the nature of the perils insured against. Plaintiff did not attach a copy of the policy to its complaint. It did not offer the alleged policy in evidence. It offered only a subrogation receipt (Plaintiff's Exhibit 15, R. pp. 9, 115) and a copy of a draft it had given to Ward (Plaintiff's Exhibit 16, R. p. 115)." This contention is specious, but not convincing.

The doctrine of subrogation originated in equity and is a creature of equity, based on principles of natural justice, and it is well-settled law that an insurance company paying a loss under the obligations of its policy to its insured for insured property damaged by the tortious act of another is entitled to subrogation to the rights of the insured against the person whose tortious act caused damage to the insured property to the extent of the loss paid by the insurance company. *Insurance Co. v. Faulkner*, 259 N.C. 317, 130 S.E. 2d 645; *Insurance Co. v. Trucking Co.*, 256 N.C. 721, 125 S.E. 2d 25; *Insurance Co. v. R. R.*, 179 N.C. 255, 102 S.E. 417.

Where insured property is damaged by the tortious act of another, *and the insurance paid the owner of the property covers the loss in full,* the insurance company, as a necessary party plaintiff, must sue in its own name to enforce its right of subrogation of the owner's indivisible cause of action against the tort-feasor. *Insurance Co. v. Trucking Co., supra,* and cases cited; *Burgess v. Trevathan,* 236 N.C. 157, 72 S.E. 2d 231. Defendants make no contention in their joint brief that the amount paid by plaintiff to Ward did not cover his loss in full.

The right of subrogation, based upon principles of equity and natural justice, has been liberally applied by the courts for the protection of those who are its natural beneficiaries. It is not necessary to produce the insurance policy in evidence when the fact of insurance and payment by insurer are otherwise proved by competent evidence. A written assignment from the insured to the insurer is admissible in evidence. *Firestone Service Stores v. Wynn,* 131 Fla. 94, 179 So. 175, *rehearing denied* 3 March 1938; *London Guarantee & Acc. Co. v. Enterprising Services,* 192 A. 2d 292, D. C. Court of Appeals (1963); 46 C.J.S., Insurance, § 1209, p. 175; 6 Appleman, Insurance Law and Practice, § 4101.

Plaintiff's evidence, considered in the light most favorable to it, shows the following facts: T. T. Ward, who is engaged in business under the trade name of North Carolina Hide & Fur Company, in May 1958 made application to George Wilkinson, who is engaged in the insurance business in Rocky Mount, North Carolina, as a general agent and who represented the Safeguard Insurance Company, for the issuance of a policy of insurance covering some furs which Ward had placed for storage in the Wilmington Cold Storage Company in Wilmington, North Carolina. Pursuant to his application, a policy of insurance No. 192926 was issued to Ward on or about 27 May 1958 by Safeguard Insurance Company, the plaintiff. Safeguard Insurance Company, plaintiff, paid Ward for damage to his furs stored in the cold storage warehouse in Wilmington the sum of $12,063.60, which payment by plaintiff was certainly a recognition on its part that it was liable for water damage to his raccoon skins under its policy issued to Ward. The subrogation receipt signed by Ward recognizes the fact that Safeguard Insurance Company had issued him its policy No. 192926, that there had been water damage to furs on storage which occurred on or about 27 September 1958, and that the insurance company had paid the loss under the obligation of its policy of insurance and was subrogated to the rights of the insured Ward against any person or persons whose tortious act or acts caused damage to the insured property to the extent of the loss paid by Safeguard Insurance Company, if there be any such

person or persons. It seems clear that plaintiff has sufficient evidence to permit a jury to find that it had a contract of insurance to support its alleged subrogation. Although defendants complain that they were not afforded an opportunity at the time of the trial to see and examine the insurance policy or to have it admitted for their own benefit, they seem to overlook the fact that having filed their answers they had a right to examine plaintiff in respect to the policy of insurance for the purpose of obtaining evidence to be used at the trial, G.S. 1-568.1 *et seq.*

In respect to the 39 bales of raccoon skins in this case, Ward was bailor and Wilmington Cold Storage Company was a bailee for hire in that it took the 39 bales of raccoon skins from Ward into its sole care and custody for hire on 27 May 1958, and from 5 July 1958 until 1 October 1958 it had in its sole care and custody for hire 38 bales of these raccoon skins; and Port City Cold Storage Company, a co-partnership, was a bailee for hire and had in its sole care and custody the same 38 bales of these raccoon skins from 1 October 1958 until 19 December 1958 when Ward withdrew these 38 bales of raccoon skins from cold storage. Ballentine, Law Dictionary, 2d Ed., p. 133, definition of "bailee for hire."

This is said in 1 Am. Jur. 2d, Act of God, § 11: "All the authorities without exception agree that a person is not liable for injuries or damages caused by an act which falls within the meaning of the term 'act of God,' where there is no fault or negligence on his part. Even where the law imposes liability irrespective of negligence, liability will not be imposed where the injury or damage is solely the result of an act of God. But one may be held liable for his own negligence even though it concurs with an act of God." To the same effect, *Southern Ry. Co. v. Cohen Weenen & Co.*, 156 Va. 313, 157 S.E. 563. Reducing the principle to the terseness of a maxim, "He whose negligence joins with the act of God in producing injury is liable therefor." *Kindell v. Franklin Sugar Refining Co.*, 286 Pa. 359, 133 A. 566.

Under the circumstances here disclosed by plaintiff's evidence, each defendant here was under a legal duty while the 38 bales of raccoon skins owned by Ward were in its possession as a bailee for hire — each defendant was not an insurer — to exercise ordinary care to protect Ward's raccoon skins against loss, damage or destruction and to return them in as good condition as when each defendant received them, and liability for damages to the 38 bales of raccoon skins while in the possession and custody of each defendant as bailee for hire turns upon the question of the presence or absence of actionable ordinary negligence on its part or on the part of its agent. Commensurate care, or due care under the circumstances, is

the measure of the obligation of a bailee for hire, in the absence of express contract. *Electric Corp. v. Aero Co.,* 263 N.C. 437, 139 S.E. 2d 682; *Dellinger v. Bridges,* 259 N.C. 90, 130 S.E. 2d 19; *Insurance Co. v. Motors, Inc.,* 240 N.C. 183, 81 S.E. 2d 416; *Vincent v. Woody,* 238 N.C. 118, 76 S.E. 2d 356; *Beck v. Wilkins,* 179 N.C. 231, 102 S.E. 313; *Hanes v. Shapiro,* 168 N.C. 24, 84 S.E. 33. Of course, the negligence of a bailee to be actionable must proximately result in the injury or damage for which damages are claimed. 8 Am. Jur. 2d, Bailments, § 177.

What is the proximate cause of an injury is ordinarily a question for a jury. It is to be determined as a fact from the attendant circumstances. Conflicting inferences of causation arising from the evidence carry the case to the jury. *Pruett v. Inman,* 252 N.C. 520, 114 S.E. 2d 360.

*Freter v. Embassy Moving and Storage Co.,* 218 Md. 12, 145 A. 2d 442, was an action against a warehouseman by the owner of goods for water, moisture and mildew damage to goods which were received by warehouseman in dry and good condition. From an adverse judgment of the circuit court, the owner appealed. In the opinion this is stated: "In the suit of the owner against the warehouseman, the trial judge, sitting without a jury, found that all of the damage had been caused by water which had entered the warehouse on August 12 and 13 (through the walls or under the door of the warehouse or both), 'not by moisture or standing in a humid place' and occurred as a result of water from hurricane Connie 'and that was an act of God, and, under an act of God, you couldn't hold the defendant responsible.' " The Court of Appeals held that the act of the warehouseman in letting the goods stay wet in wet cardboard cartons for over three weeks without any effort to mitigate damage already caused or to prevent further deterioration, was evidence of negligence on the part of the warehouseman to be weighed by the trier of facts.

Plaintiff's allegations in its complaint are in brief summary: When Ward placed his 39 bales of raw raccoon skins in a cold storage warehouse owned and operated for hire by Wilmington Cold Storage Company in Wilmington, North Carolina, these raw raccoon skins were in excellent condition, dry and undamaged, and when the Wilmington Cold Storage Company received these 39 bales of raw raccoon skins, it stored them on the top floor of its cold storage warehouse; on or about 27 September 1958 a storm known as Hurricane Helene struck Wilmington, North Carolina; that the hurricane did so much damage to the roof of the cold storage warehouse owned and operated by Wilmington Cold Storage Company that it had to be replaced by a new roof, and that the damage to the roof

of said building permitted the entrance into the storage room where the raw raccoon skins were stored of great quantities of rain water; that the rain water thoroughly soaked each and every bale of raw raccoon skins; that on 1 October 1958 Port City Cold Storage Company, a co-partnership, bought the business and warehouse owned and operated by Wilmington Cold Storage Company in which these raw raccoon skins owned by Ward were stored, and operated for hire the cold storage warehouse from that date until after the 38 bales of raw raccoon skins were removed by Ward on 19 December 1958; that when Ward removed his raw raccoon skins from storage it was discovered that at least one of the bales was damaged, the same being wet and moldy, and then for the first time Port City Cold Storage Company, a co-partnership, notified Ward of this condition; that both defendants were guilty of negligence after Hurricane Helene struck Wilmington in failing to properly and carefully inspect the bales of raw raccoon skins, and in failing to make any effort to mitigate the damage already caused by water from the hurricane on these 38 bales of raw raccoon skins or to prevent further deterioration or damage to the 38 bales of raw raccoon skins, and in negligently failing to notify Ward of their wet condition so that he could make proper efforts to prevent further deterioration of the raw raccoon skins. Considering plaintiff's evidence in the light most favorable to it, it has offered evidence in substantial support of the allegations in its complaint above summarized. Ward testified that in his opinion the fair market value of the raccoon skins he placed in the Wilmington Cold Storage Company on 27 May 1958 was $22,000, and the fair market value of the 38 bales of raw raccoon skins that were delivered to him on 19 December 1958 was around $10,000.

In passing upon plaintiff's assignment of error to the entry of the judgment of compulsory nonsuit of its action, if any incompetent evidence offered by plaintiff was permitted by the judge to be admitted over defendants' objections and exceptions, it must be considered. *Langley v. Insurance Co.*, 261 N.C. 459, 135 S.E. 2d 38. As Higgins, J., said in *Early v. Eley*, 243 N.C. 695, 91 S.E. 2d 919, "Though erroneously admitted, nevertheless, we must consider them as a part of the plaintiff's case on the question of nonsuit for the reason that their admission may have caused the plaintiff to omit competent evidence of the same import."

Considering plaintiff's evidence with that degree of liberality required on motions for judgment of compulsory nonsuit, and the judicial admissions in the separate answer of each defendant as above set forth, plaintiff's evidence makes out a *prima facie* case against each defendant, consistent with the allegations of the complaint, that

on 27 September 1958, and prior thereto, Wilmington Cold Storage Company had in its exclusive possession on the top floor of its cold storage warehouse in Wilmington, North Carolina, as a bailee for hire, 38 bales of raw raccoon skins owned by T. T. Ward, bailor; that on 27 September 1958 Hurricane Helene, an act of God, 1 C.J.S., Act of God, pp. 1427-30 (defendants in their joint brief contend Hurricane Helene was an act of God), struck Wilmington and damaged the roof of the cold storage warehouse in which Ward's 38 bales of raw raccoon skins were stored, and water from the hurricane came through its roof and wet Ward's bales of raw raccoon skins; that on 1 October 1958 Port City Cold Storage Company, a co-partnership, bought from Wilmington Cold Storage Company its cold storage warehouse, and from that date until 19 December 1958, when Ward withdrew his 38 bales of raw raccoon skins from storage, it had in its exclusive possession as a bailee for hire Ward's 38 bales of raw raccoon skins; that both defendants knew, or in the exercise of ordinary care could have discovered, that Ward's 38 bales of raw raccoon skins were wet by reason of water coming into the top floor of the cold storage warehouse as a result of Hurricane Helene causing damages to its roof; that the acts of each defendant in letting the 38 bales of raw raccoon skins stay wet in the bales without making any effort to mitigate damage already caused by water or to prevent further deterioration, and without making any effort to notify Ward before he withdrew his 38 bales of raw raccoon skins from storage on 19 December 1958 that his 38 bales of raw raccoon skins were wet, so that Ward could make efforts to mitigate the damage already done to his raw raccoon skins by water, and to prevent further deterioration, were acts of negligence on the part of each defendant, which joined with an act of God proximately resulted in loss and damage to Ward; that plaintiff under the obligations of a policy of insurance with extended coverage, No. 192926, issued by it to Ward and covering loss to Ward's raw raccoon skins in storage has paid to Ward his entire loss on his raccoon skins in the sum of $12,063.60, and is entitled to subrogation to the rights of its insured Ward against each defendant to the extent of the loss paid by plaintiff, and must sue in its own name to enforce its rights of subrogation of Ward's indivisible cause of action against each tort-feasor. The facts here are easily distinguishable from the facts in *Swain v. Motor Co.*, 207 N.C. 755, 178 S.E. 560, relied on by defendants, and in *Morgan v. Bank*, 190 N.C. 209, 129 S.E. 585.

While plaintiff's evidence makes out a *prima facie* case of negligence against each defendant, and is sufficient to carry its case to

the jury, the ultimate burden of proof of establishing actionable negligence against each defendant is on plaintiff, and remains on it throughout the trial. *Electric Corp. v. Aero Co., supra.* As to the measure of damages in a case like this, see *Insurance Co. v. Lumber Co.,* 186 N.C. 269, 119 S.E. 362; Appleman, *ibid,* § 4103.

The judgment of compulsory nonsuit was improvidently entered, and is

Reversed.

MOORE, J., not sitting.

DENNY, E.J., took no part in the consideration and decision of this case.